**Jermaine COLEMAN, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 41A01–0505–CR–196.**

Court of Appeals of Indiana.

May 18, 2006.

Rehearing Denied July 27, 2006.

Kathleen M. Sweeney, Indianapolis, for Appellant.

Steve Carter, Attorney General of Indiana, Matthew D. Fisher, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Jermaine Coleman (Coleman), appeals from the trial court's denial of his Motion to Suppress.

We reverse.

### ISSUE

Coleman raises one issue on appeal, which we restate as: Whether, under the

Fourth Amendment to the United States' Constitution and Article I, Section 11 of the Indiana Constitution, the police officers legally obtained evidence in a stop and search of Coleman.

## FACTS AND PROCEDURAL HISTORY

In July of 2004, officers from the Greenwood Police Department in Johnson County, Indiana were attempting to make drug-related arrests at an area shopping mall. In furtherance of this goal, Greenwood Police Sergeant Jeffrey McCorkle (Sergeant McCorkle) met with an incarcerated confidential informant (C.I.), who relayed that he had previously bought cocaine at the mall from a man named "J.C." On July 13, 2004, C.I. called "J.C." and arranged to meet him at the mall later that day in order to pay off a debt and buy some crack cocaine. Thereafter, the Greenwood Police Department transported C.I. to the pre-arranged buy in an unmarked police vehicle, while additional police vehicles followed.

From inside the unmarked vehicle, C.I. identified Coleman as "J.C.," who was waiting outside of a department store. Since C.I. was in custody on a theft charge, officers did not allow him to exit the vehicle and attempt a transaction with Coleman. Rather, after C.I. identified Coleman as the man he had previously bought crack cocaine from, Officer James Long (Officer Long), in uniform, stopped Coleman and asked if he was "J.C." Coleman indicated that he was "J.C.," and that he was there to meet a friend who owed him money. Officer Long then asked Coleman if he could conduct a pat-down search of his person. Coleman agreed, and as a result of the frisk, a digital scale, illegal drug residue, and parts of plastic baggies were found. Officer Long subsequently handcuffed Coleman and placed him in his police vehicle.

Next, Sergeant McCorkle and Johnson County Sheriff's Deputy James Drake (Deputy Drake) approached and asked Coleman what kind of vehicle he drove, and where it was located. Once Coleman's vehicle was located, a K–9 unit detected the presence of narcotics. A subsequent search of the vehicle revealed a gravel-like substance that tested positive for cocaine.

On July 16, 2004, the State filed an information charging Coleman with possession of cocaine, as a class D felony, Ind.Code § 35–48–4–6(a). On November 10, 2004, Coleman filed a Motion to Suppress. On February 16, 2005, a hearing was held on the motion, and on March 8, 2005, the trial court denied the motion. On April 6, 2005, Coleman filed a motion for interlocutory appeal, which the trial court granted. On August 30, 2005, we accepted jurisdiction of this case.

Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

Coleman argues that the Greenwood Police Department did not have reasonable suspicion or probable cause to stop him outside of the mall and conduct a pat-down search. Specifically, Coleman asserts that the C.I.'s identification of him, alone, was not sufficient to support an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); thus, Coleman contends that the evidence recovered by frisking him and subsequently searching his car was illegally obtained.

We review a trial court's ruling on a motion to suppress in a manner similar to claims challenging the sufficiency of the evidence. *Williams v. State*, 745 N.E.2d 241, 244 (Ind.Ct.App.2001). Thus, in reviewing a trial court's decision on a motion to suppress, we do not reweigh the

evidence or judge the credibility of witnesses, but determine if there was substantial evidence of probative value to support the trial court's ruling. *Id.* When evaluating determinations of reasonable suspicion, we accept the factual findings of the trial court unless they are clearly erroneous. *Id.* However, the ultimate determination of reasonable suspicion is reviewed *de novo. Id.*

■ The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution protect the privacy and possessory interests of individuals by prohibiting unreasonable searches and seizures. *Burkett v. State,* 785 N.E.2d 276, 278 (Ind.Ct.App. 2003). Generally, a lawful search requires a judicially issued search warrant. *Id.* When a search is conducted without a warrant, the State has the burden of proving that an exception to the warrant requirement existed at the time of the search. *Id.* The United States Supreme Court established one such exception in *Terry v. Ohio,* which announced the rule that a police officer may briefly detain a person for investigatory purposes without a warrant or probable cause, if, based on specific and articulable facts together with reasonable inferences from those facts, the officer has a reasonable suspicion of criminal activity. *Id; Parker v. State,* 662 N.E.2d 994, 995 (Ind.Ct.App.1996), *trans. denied.* Reasonable suspicion is determined on a case-by-case basis by looking at the totality of the circumstances, but is generally satisfied when the facts known to the officer at the moment of the stop, along with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur. *Bridgewater v. State,* 793 N.E.2d 1097, 1100 (Ind.Ct.App.2003), *trans. denied.* In addition to detainment, a police

officer can conduct a limited search of the individual's outer clothing for weapons if the officer reasonably believes the individual is armed and dangerous. *Parker,* 662 N.E.2d at 995.

Since *Terry,* the Supreme Court has considered the use of an informant's tip as the basis for an investigatory stop. *Id.* In *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court upheld an investigatory stop where the informant "was known to [the officer] personally and had provided him with information in the past," and the informant "came forward personally to give information that was immediately verifiable at the scene." *Parker,* 662 N.E.2d at 996. Particularly, in that case, a well-known informant approached a police officer in a high-crime area and told him that someone in a nearby vehicle possessed narcotics and a weapon. *Id.* Then, in *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the Court upheld the validity of a stop, based on a tip, although anonymous, because the tip was significantly corroborated by independent police work. *Parker,* 662 N.E.2d at 996. Specifically, the anonymous caller there was able to name White and inform the police that White would be leaving a particular apartment, at a particular time, in a particular vehicle, and would be heading to a particular motel with cocaine in her possession. *Id.* Prior to making the stop, a police officer went to the address given by the informant, and observed White leave in the described vehicle and head toward the named motel. *Id.* Holding that such corroborated tips are sufficiently reliable to justify a *Terry* stop, the Court focused on the premise that reasonable suspicion is a less demanding standard than probable cause, and stressed that both the quantity and reliability of the information used as the basis for a stop should be considered in

light of the totality of the circumstances. *Id.*

In *Parker*, this court affirmed a denial of a motion to suppress where an informant provided information by telephone that Parker, an African American male, wearing shorts, a plaid shirt, and a cap, was carrying cocaine in a plastic bag, and planned to sell the cocaine at a particular liquor store. *Id.* at 995. In this case, the police were very familiar with the informant, as he had been on the police payroll for several years and provided information leading to the conviction of other suspected drug dealers. *Id.* Then, while en route to the liquor store, the officers saw the informant in person, and the informant verified the information he had previously given. *Id.* Thereafter, the police saw a man matching Parker's description near the liquor store and instigated an investigatory stop of him. *Id.* In applying the principles of *Adams* and *White*, we concluded that the informant's tip provided sufficient detail of corroborated facts, as well as a reliable prediction of Parker's future behavior. *Id.* at 997. Additionally, we noted that these facts combined included the strongest facts present in both *Adams* and *White*. While *Adams* involved a reliable informant, the informant's tip was not detailed; and while *White* involved a detailed tip, the informant was anonymous, and not well known to police.

Here, our review of the record indicates that in stopping Coleman, the police officers relied on the C.I.'s initial tip, his subsequent telephone conversation with "J.C." arranging the meeting, and then finally his identification of Coleman as "J.C." at the pre-determined meeting place. The record further reveals that the C.I. was not a well-known informant, but rather had only given the police one reliable tip in the past, on the very same day that he provided the tip about Coleman.

Also, the record discloses that the officers were only able to hear the C.I.'s side of the telephone conversation in arranging the meeting with "J.C."; thus, the police officers relied entirely on the C.I.'s statement that "J.C." would be waiting at the mall and would have cocaine with him. While the C.I. did give a general description of "J.C." as a 5'10" African American male, approximately thirty (30) years old, the record fails to show that the C.I. gave any specific description of "J.C." prior to identifying him.

We find that this set of facts presents us with a close case. However, under the totality of the circumstances, we ultimately conclude that the officers here lacked the requisite reasonable suspicion to stop Coleman. Unlike *Parker*, which combined the strongest facts of *Adams* and *White*, this case combines the weakest facts of those cases—specifically, the officers here relied on a new informant who gave a tip consisting of little detail. The record shows that the C.I. had no history of drug-related crimes, and in fact was in custody on his first offense of any sort. In on our review of the record, we also find that the officers did not independently investigate the tip on Coleman prior to stopping him. Although C.I.'s telephone conversation with "J.C." was corroborated by "J.C.'s" presence at the mall, the officers had a limited history with C.I., and little guarantee that he was telling the truth. Thus, the police officers could not corroborate that the man waiting in front of the department store was in fact "J.C." until after they stopped him. Also, Officer Long testified at the hearing on the Motion to Suppress that he did not observe Coleman committing a crime, or even acting suspiciously, before he stopped him. *See Parker*, 662 N.E.2d at 995. Furthermore, the record shows that a mall surveillance videotape of Coleman walking around the mall prior to the

meeting showed no signs of criminal activity. *Id.*

In addition, we have concerns as to the hastiness of the police work in Coleman's case. From the record, it is apparent that the Greenwood Police Department conducted several pre-arranged drug buys and made numerous drug-related arrests the day Coleman was arrested. And while the record is void as to the amount of investigating that preceded the other arrests that day, the record here indicates that the police officers met with the C.I., set up the meeting between the C.I. and Coleman, and arrested Coleman all in one day. Further, the record suggests that the officers did not pursue a search warrant in this case because their time was constrained due to the several other "deals" scheduled for that day. (Transcript p. 84).

In contrast, our evaluation of the facts in other cases involving confidential informants assisting in the arrests of drug dealers shows that the police typically arrange more than one meeting, and typically observe an actual drug transaction before instigating a stop of the suspect. *See Smith v. State,* 829 N.E.2d 64, 67 (Ind.Ct. App.2005) (police officers arranged and observed three separate controlled drug buys prior to arresting defendant); *see also Howard v. State,* 761 N.E.2d 449, 451 (Ind. Ct.App.2002), *trans. denied* (police used two confidential informants in two controlled drug buys prior to arresting defendant); *Hendrickson v. State,* 690 N.E.2d 765, 766 (Ind.Ct.App.1998) (police officers conducted a series of controlled drug buys over a two-month period prior to arresting defendant). At a minimum, our limited review of similar cases upholding investigatory stops premised by a tip reveals that the police officers have either had some background knowledge regarding the suspect, or taken additional time to investigate the information provided in the tip. *See Moultry v. State,* 808 N.E.2d 168, 170 (Ind.Ct.App.2004) (two days after being given a tip about a drug dealer named "Chris" working out of a white Cadillac, the police officer located the Cadillac, ran a license plate check of the vehicle, and discovered that Christopher Moultry had committed previous drug related offenses); *see also Johnson v. State,* 659 N.E.2d 116, 117 (Ind.1995) (investigatory stop still not upheld although the officer receiving the tip personally knew defendant and had arrested defendant previously for a narcotics violation).

In the case before us, the C.I. was unable to provide the officers with a first or last name of the suspected drug dealer. Also, apparently due to self-imposed time constraints, the officers only arranged one controlled buy with "J.C.", which was never even completed. Thus, we conclude that predominately unsubstantiated tips like the one here either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. *See id.* at 119. Accordingly, in such cases where the record shows that the police officers acted in a hurried fashion and did not take the time to carefully substantiate a tip, we find the exclusionary rule especially appropriate. *See Camp v. State,* 751 N.E.2d 299, 302–03 (Ind.Ct.App. 2001), *reh'g denied, trans. denied* (the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of deterring police misconduct in the criminal context).

Additionally, we note that our evaluation of the record leads us to conclude that the cocaine seized from Coleman's vehicle was the result of an invalid search. Particularly, the record indicates that Coleman was detained during the search of his vehicle without ever being advised of his *Miranda* rights. *See Sellmer v. State,* 842 N.E.2d

358 (Ind.2006) (trial court should have granted defendant's motion to suppress evidence where officers failed to inform defendant, in custody, of her right to consult with counsel before consenting to a search of her vehicle). When police perform a warrantless search, as was conducted in Coleman's case, the burden is on the State to demonstrate that it falls into one of the exceptions to the warrant requirement. *Johnson,* 659 N.E.2d at 119. Even under a "clearly erroneous" standard of review, the State has failed to meet its burden. Accordingly, in light of the flaws in the officers' stop and subsequent search of Coleman's vehicle, we conclude that all the evidence derived from the stop must be suppressed.

## CONCLUSION

Based on the foregoing, we conclude that the trial court erred in not granting Coleman's Motion to Suppress.

Reversed.

DARDEN, J., concur.

VAIDIK, J., concurring in result with separate opinion.

VAIDIK, Judge, concurring in result.

I respectfully disagree with the majority's conclusion that the police officers lacked reasonable suspicion to stop Coleman based on the confidential informant's tip. But because the cocaine found in Coleman's car was the result of an invalid search, I agree with the majority that the cocaine from Coleman's car must be suppressed.

Here, the confidential informant, who was an admitted crack cocaine addict, was in police custody on a theft charge stemming from an incident where he stole a credit card to pay off his drug debt. In order to receive lenient treatment for the theft charge, the informant gave the police information about some of his cocaine suppliers. Based on the informant's tip, the police were able to arrest one man. After that arrest and on the same day, the informant told the police about another one of his suppliers, a man named "J.C." who he would typically meet at a bench outside of L.S. Ayres at Greenwood Park Mall. The informant gave a description of J.C. as a black male, approximately thirty years old, and approximately 5'10". The informant, who knew J.C.'s phone number, called J.C. from a payphone at L.S. Ayres. Officer Jeffrey McCorkle listened to the informant's side of the conversation. Specifically, the informant used the name "J.C.," told J.C. that he had the money that he owed him, and asked to purchase a quarter-ounce of crack cocaine. The informant agreed to meet J.C. on the north side of L.S. Ayres at Greenwood Park Mall, their usual meeting place, at a specific time.

At the specified time, Officer McCorkle drove the informant past L.S. Ayres in an unmarked car, and the informant pointed out J.C., who was walking outside of L.S. Ayres at the time, as the man from whom he had purchased cocaine. At that point, Officer McCorkle instructed a marked patrol unit to approach the man. Officer McCorkle approached shortly thereafter and asked the man if he was J.C., and he said "yes." The man also said that he was there to meet a friend who owed him money. The man provided Officer McCorkle with identification, which was in the name of "Jermaine Coleman."

Though the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution protect citizens against unreasonable search and seizure, police officers may briefly detain an individual if they have reasonable suspicion that criminal activity has occurred or is about to occur. *Burkett v. State,* 785 N.E.2d 276, 278 (Ind.Ct.App.

2003). "The reasonable suspicion requirement is satisfied where the facts known to the officer at the moment of the stop, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur." *State v. Gladney*, 793 N.E.2d 264, 268 (Ind.Ct.App.2003), *reh'g denied*, *trans. denied*. In addition to stopping the individual, the officer can conduct a reasonable search for weapons for the protection of the officer, where he has reason to believe that he is dealing with an armed and dangerous individual. *Wilson v. State*, 745 N.E.2d 789, 792 (Ind.2001).

A tip from an identified or known informant can provide the basis for an investigatory stop if it contains sufficient indicia of reliability. *Kellems v. State*, 842 N.E.2d 352, 355 (Ind.2006). One of the reasons for this is that "a known or identified informant's reputation can be assessed and ... [he may] be held responsible if [his] allegations turn out to be fabricated ...." *Id.* (quotation omitted). Whether a tip has sufficient indicia of reliability is determined by looking at the totality of the circumstances. *Id.* at 356. The court must first determine whether the informant is reliable, such as if the informant provided information in the past that has resulted in an arrest and/or conviction. *See Johnson v. State*, 659 N.E.2d 116, 119 (Ind.1995). The court must determine whether the informant's tip provided specifics by which it could be confirmed. *Id.* at 119. In determining whether a tip has been sufficiently corroborated, a court must distinguish between information that is easily knowable by many members of the general public and that which is known to only a few. *See id.* at 118–19; *see also State v. Stickle*, 792 N.E.2d 51, 55 (Ind.Ct. App.2003) ("Because only a small number of people are generally privy to an individual's itinerary, it is reasonable to believe that people with access to such information are likely to also have access to reliable information about the individual's illegal activities."), *trans. denied*.

Admittedly, there is always more that the police can do before stopping an individual for suspected criminal activity. However, that is not the issue before us. Rather, the issue is whether these facts are enough to establish reasonable suspicion to stop and frisk Coleman. I believe that they do. Specifically, these facts demonstrate that the informant provided the police with credible information on a specific impending crime that the police confirmed by listening to the informant's side of the telephone conversation with J.C., by driving the informant past L.S. Ayres at the pre-determined meeting time, and by asking the man if he was J.C. In addition, the information the informant gave the police was not easily knowable by the general public and showed that the informant had intimate knowledge of J.C.'s personal itinerary. Moreover, the police provided information that the informant was reliable. The record shows that earlier that same day, the informant gave the police information about another one of his cocaine suppliers that resulted in an arrest.

Based on all of these facts, I believe that the police had reasonable suspicion to stop Coleman. In addition, Officer James Long, who frisked Coleman, testified that he feared for his safety because drug deals frequently involve firearms; therefore, I believe that the pat down was proper. Moreover, the record shows that Coleman consented to the pat down. Therefore, the evidence found during the frisk is admissible.

However, I must agree with the majority that the cocaine seized from Coleman's car was the result of an invalid search.

That is, the record shows that at the time of the search of his car, Coleman was handcuffed and in police custody, but he had not been advised of his *Miranda* rights. Specifically, Coleman should have been told of his right to consult counsel before agreeing to the search of his car. *See Sellmer v. State*, 842 N.E.2d 358 (Ind. 2006). Furthermore, the State has failed to prove that the search of Coleman's car falls into one of the exceptions to the warrant requirement. Consequently, the cocaine found in Coleman's car should be suppressed. I therefore concur in result.